James L. Arrasmith, Esq., SBN # 332498
The Law Offices of James L. Arrasmith
5150 Sunrise Boulevard, Suite G-1
Fair Oaks, CA 95628
Telephone: (916) 974-9835
E-mail: wolves@jlegal.org

Attorney for Plaintiff, *ROBERT EVANS*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ROBERT EVANS,**<br><br>*Plaintiff,*<br><br>vs.<br><br>**COUNTY OF IMPERIAL; THE STATE OF CALIFORNIA; and DOES 1–50, inclusive,**<br><br>*Defendants.* | **Case No.: 3:25-cv-00249-TWR-LR**<br><br>**FIRST AMENDED COMPLAINT FOR:**<br>**1. INVERSE CONDEMNATION (U.S. Const. amends. V, XIV; Cal. Const. art. I, § 19)**<br>**2. VIOLATION OF DUE PROCESS (42 U.S.C. § 1983)**<br>**3. DENIAL OF EQUAL PROTECTION (42 U.S.C. § 1983)**<br>**4. DECLARATORY RELIEF (28 U.S.C. §§ 2201–2202)**<br><br>**JURY TRIAL DEMANDED**<br><br>Judge: Hon. Todd W. Robinson<br>Courtroom: 14A |

Plaintiff ROBERT EVANS, by and through his attorney of record, The Law Offices of James L. Arrasmith, alleges as follows:

**I.  JURISDICTION AND VENUE**

1.      This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, because this action arises under the Constitution of the United States and 42 U.S.C. § 1983.

1

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

2.     This Court has supplemental jurisdiction over Plaintiff's state-law claim pursuant to 28 U.S.C. § 1367, because that claim is so related to the federal claims that it forms part of the same case or controversy.

3.     Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Imperial County, California, and the subject real property is located within this District. Plaintiff filed this action in the Superior Court of California, County of Imperial, on December 3, 2024 (Case No. ECU003850); Defendant County of Imperial removed it to this Court on February 3, 2025 pursuant to 28 U.S.C. §§ 1331 and 1441. This First Amended Complaint is filed pursuant to the Court's May 20, 2026 Order granting Plaintiff leave to amend (ECF No. 22).

## II.  PARTIES

4.     Plaintiff ROBERT EVANS (also known as Robert Evans, Jr.) is an individual residing in Grandview, Washington. He is a grandson and heir of Albert Evans (recorded in Imperial County title records as "A. B. Evans"), who owned and occupied the subject property at the time of its seizure in December 1941. Plaintiff's standing and succession allegations are set forth in Section III below.

5.     Defendant COUNTY OF IMPERIAL (the "County") is, and at all relevant times was, a political subdivision of the State of California, with its principal place of business at 940 W. Main Street, El Centro, California 92243. As alleged below, the County, through its officials, agents, and employees, participated in the taking of Albert Evans's property in December 1941, appears as a grantee and a grantor in the recorded instruments through which the surrounding lands were assembled and conveyed for

2

FIRST AMENDED COMPLAINT

wartime military use, and thereafter, through its records officials, repeatedly and falsely denied to Albert Evans's descendants that Albert Evans had ever owned property in Imperial County.

6.     Defendant THE STATE OF CALIFORNIA (the "State") is a sovereign state of the United States of America. Plaintiff is informed and believes, and on that basis alleges, that the State, through its agencies and officials, participated in and benefited from the wartime acquisition of the subject property. The claims asserted against the State in this First Amended Complaint are limited to the First Cause of Action (inverse condemnation) and the Fourth Cause of Action (declaratory relief); the Second and Third Causes of Action under 42 U.S.C. § 1983 are asserted against the County and the Doe defendants only. Questions concerning service of process upon the State and the State's amenability to suit in this forum are addressed in Plaintiff's concurrently filed Response to the Court's May 20, 2026 Order to Show Cause, and Plaintiff preserves all positions stated therein, including remand of the state-law claim to the Superior Court in lieu of dismissal should the Court determine that it may not proceed against the State in this forum.

7.     The true names and capacities of Defendants DOES 1 through 50, inclusive, are presently unknown to Plaintiff. The Doe defendants include the individual officials who carried out the December 26, 1941 dispossession alleged below and the County personnel who later made the misrepresentations alleged below, whose identities Plaintiff has been unable to ascertain by reason of the passage of time and the condition and accessibility of Defendants' records. Each fictitiously named Defendant is responsible in

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

3

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

some manner for the acts and omissions alleged herein. Plaintiff will amend this First Amended Complaint to allege their true names and capacities when ascertained.

### III.  STANDING AND SUCCESSION

8.     Albert Evans was born in 1883 in the American South and, before settling in Imperial County, resided in Tulare County, California. He died in or about December 1965. According to family accounts, at the time of his death he was living in a single rented room in a boarding house, never having been compensated for the loss of the property described below.

9.     Albert Evans was survived by his children—approximately twelve in number—and by their descendants. Plaintiff is informed and believes, and on that basis alleges, that Albert Evans died without a will, that no proceeding is now pending in California for administration of his estate, and that any claims arising from the taking of his property passed to his heirs.

10.    Plaintiff's father, Robert Evans, was raised in the household of Albert Evans and Albert Evans's wife, Mary Pearl Evans, in the Imperial Valley. Plaintiff is informed and believes, and on that basis alleges, that his father was Albert Evans's son and that Plaintiff is Albert Evans's grandson. Plaintiff's mother, Betty Jean Wallice, married Plaintiff's father in 1951 and personally knew Albert Evans, the Evans family, and the family's dairy operation. (See Declaration of Betty Jean Wallice, attached as Exhibit B and incorporated by reference.)

11.    Plaintiff brings this action as an heir and successor in interest of Albert Evans within the meaning of California Code of Civil Procedure sections 377.30 and 377.32. To the extent other heirs of Albert Evans hold interests in the claims alleged

4

herein, Plaintiff sues for his own interest as an heir, and joinder of any additional heirs will be addressed pursuant to Federal Rules of Civil Procedure 17 and 19 as the Court may direct.

### IV.  GENERAL FACTUAL ALLEGATIONS

### A.  Albert Evans's Acquisition and Development of the Property

12.    Plaintiff does not presently allege that the June 4, 1945 instrument constituted a voluntary, market-rate, fully compensated conveyance. Plaintiff lacks the complete instrument, consideration record, closing file, acquisition correspondence, and circumstances of execution. Plaintiff alleges that the 1945 instrument is consistent with post-dispossession papering of an earlier physical ouster and will seek the complete acquisition file, payment records, and witness/archival evidence in discovery. Plaintiff alleges, based on family declarations, the related 1945 record naming A.B. Evans and Mary Pearl Evans, and other genealogical and family-history evidence, that "A. B. Evans" was Albert Evans, Plaintiff's grandfather. A portion of the lands described in the title record discussed below as "Parcel 2," located in Imperial County, California, and associated with the present-day address 2024 Bennett Road, El Centro, California 92243 (the "Property"). According to accounts passed down within the family, the family acquired the land for approximately one dollar per acre, and family members have long described the acquisition as having been accomplished by quitclaim deed in or about 1938 to 1939. The complete recorded chain of title is set forth in paragraph 25 below and in Exhibit A.

13.    Albert Evans invested substantial labor and financial resources in developing the Property into a productive dairy farm. He constructed two residential structures, a

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

5

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

large barn, and other agricultural improvements on the land, and he maintained a working herd of approximately 300 to 500 head of cattle. According to family and community accounts, his dairy was one of the largest in the Imperial Valley region at the time, and Plaintiff is informed and believes, and on that basis alleges, that Albert Evans was recognized in the Imperial Valley as a pioneering farmer and was among the most substantial Black landowners in California of his era.

14.    Albert Evans's ownership and use of the Property is further corroborated by a recorded easement that he granted for a drainage ditch (a "ditch bank") and for the installation of utility lines across or adjacent to the Property. As alleged in paragraph 35(d) below, when Plaintiff searched Imperial County records in or about 2022 with the assistance of a real estate agent, that easement record was the only record locatable in his grandfather's name.

15.    Albert Evans was the owner and occupant of the Property on and before December 7, 1941, when Japan's attack on Pearl Harbor brought the United States into World War II.

**B.  The Property's Recorded History and the Wartime Military Project**

16.    The recorded chain shows that the Property passed through the County's tax-collection machinery during the Depression: a tax deed recorded July 10, 1931 (Book 316, Page 172), from the Tax Collector of Imperial County to the State of California, and a further conveyance recorded June 4, 1936 (Book 429, Page 561), from the Tax Collector of Imperial County to the Imperial Irrigation District, preceded the 1939 conveyance to Albert Evans. The County and its officers were thus directly involved in the recorded history of the Property both before and after Albert Evans's ownership.

6

FIRST AMENDED COMPLAINT

17.    In the weeks following the December 7, 1941 attack on Pearl Harbor, federal, state, and local authorities undertook an urgent program of military construction in the Imperial Valley. Ground was broken for the wartime air-station project at the site on or about January 8, 1942—thirteen days after the events of December 26, 1941, alleged below. The installation was commissioned as Marine Corps Air Station El Centro on July 23, 1943, was redesignated Naval Air Station El Centro in 1946, and has operated since 1979 as Naval Air Facility El Centro. The Property lies within the present boundaries of that installation.

18.    Plaintiff is informed and believes, based on accounts passed down within the family, and on that basis alleges, that four of Albert Evans's sons were called into military service in December 1941, in the days following the United States' entry into the war and shortly before the events of December 26, 1941, alleged below.

**C. The December 26, 1941 Dispossession**

19.    On or about December 26, 1941—nineteen days after the attack on Pearl Harbor, and the day after Christmas—government officials arrived at the Property and informed Albert Evans that he had 48 hours to vacate his land or face forcible removal. Plaintiff is informed and believes, based on accounts passed down within the Evans family, and on that basis alleges, that the officials included representatives of both the County of Imperial and the State of California. The officials stated, in substance, that the land was required for wartime military use in connection with the military development then being undertaken in the area—development that included the air-installation project for which ground was broken thirteen days later, on January 8, 1942.

7

FIRST AMENDED COMPLAINT

20.    Albert Evans verbally protested the taking to the officials present at the Property on December 26, 1941, asserting that the land was his and that he had not been paid. The officials told him, in substance, that the government was taking the land for the war effort and that he had no choice but to leave. He was given no documentation of the taking, no written notice, and no information about how to pursue a claim for compensation. Albert Evans—who had been born in the South in 1883 and understood the violence visited upon Black families who resisted white officials—reasonably feared for his life and for the lives of his family if he refused to leave.

21.    Within the 48-hour period, Albert Evans and his family were compelled to abandon their home, their cultivated crops, their improvements, and much of their equipment, and to relocate a working dairy herd of several hundred head on 48 hours' notice, at ruinous cost and loss, to a new site in the surrounding area, where the operation continued only on a diminished basis.

22.    Defendants seized the Property without initiating or completing any eminent domain proceeding, without providing Albert Evans notice or a hearing, and without paying any compensation whatsoever. No condemnation judgment, declaration of taking, purchase agreement, or record of compensation to Albert Evans appears anywhere in the recorded chain of title. (Ex. A.)

23.    On the same day—December 26, 1941—an instrument was recorded in the Official Records of Imperial County (Book 582, Page 134) conveying from the Imperial Irrigation District to the County of Imperial certain lots and parcel portions within the same lands described in the title record (Lots 3, 4, 5, 6, 7, 12, and 13, the north half of the east half of the southwest quarter, and portions of Parcels 1 and 2). Two weeks earlier, a

conveyance of additional adjoining lots from private owners (A. C. Burch et al.) to the Imperial Irrigation District, originally recorded August 23, 1941, had been re-recorded on December 12, 1941 (Book 581, Page 241). Plaintiff is informed and believes, and on that basis alleges, that these recordings reflect a coordinated assembly of land for the wartime project, undertaken in the very period in which Albert Evans was dispossessed—but that, as to Albert Evans's own parcel, no instrument of any kind was recorded in December 1941: he was simply removed.

**D.  Jim Crow Conditions in the Imperial Valley**

24.    The seizure occurred during the Jim Crow era, a period of pervasive racial discrimination throughout the United States and specifically in Imperial County, California. As an African American man in rural California in 1941, Albert Evans faced severe institutional barriers to seeking legal redress. The combination of racial hostility, lack of access to legal counsel, denial of the equal protection of the laws, fear of physical retaliation—including the lynchings and racial violence then visited upon Black families—and the wartime climate of deference to government authority rendered it effectively impossible for Albert Evans to assert his constitutional rights through available legal channels. Racial segregation in the region was pervasive and enduring: the City of El Centro maintained racially separate public schools for Black children; the town of Imperial was residentially segregated along racial lines; and, on information and belief, Imperial County was among the last counties in California to desegregate its public schools, with school segregation in the El Centro area persisting into the 1950s. These discriminatory conditions persisted throughout the Imperial Valley for decades after the 1941 taking. Albert Evans was an African American landowner in a racially segregated

9

FIRST AMENDED COMPLAINT

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

rural county. Family witnesses describe pervasive segregation and fear of retaliation against Black residents who challenged local white authority. Plaintiff alleges that those conditions, combined with wartime deference to government officials and lack of access to counsel, materially impaired Albert Evans's practical ability to pursue a constitutional claim at that time.

**E.  The Recorded Chain of Title**

25.   The complete recorded chain of title for the south 39 acres of Tract 157, as set forth in Chain of Title Guarantee No. 5013500-0623-6966330 issued by First American Title Insurance Company, bearing a Date of Guarantee of March 30, 2023 (the "Guarantee," a true and correct copy of which is attached as Exhibit A and incorporated by reference), is as follows:

> (a)  Recorded July 10, 1931, Book 316, Page 172: Tax Collector, County of Imperial, to the State of California (south 39 acres, Tract 157, portion of Parcel 2);

> (b)  Recorded August 2, 1935, Book 377, Pages 82–86: Imperial Irrigation District to Imperial Irrigation District of El Centro (south 39 acres, Tract 157, portion of Parcel 2);

> (c)  Recorded June 4, 1936, Book 429, Page 561: Tax Collector, County of Imperial, to the Imperial Irrigation District (south 39 acres, Tract 157, portion of Parcel 2);

> (d)  Recorded August 10, 1939, Book 529, Page 449: Imperial Irrigation District to A. B. Evans (south 39 acres, Tract 157, portion of Parcel 2)— Albert Evans's acquisition of the Property;

10

(e)  Recorded December 26, 1941, Book 582, Page 134: Imperial Irrigation District to the County of Imperial (Lots 3, 4, 5, 6, 7, 12, and 13, N1/2 E1/2 SW1/4, portions of Parcels 1 and 2)—recorded the same day Albert Evans was dispossessed;

(f)  Recorded October 2, 1942, Book 595, Page 7: Imperial Irrigation District to Wendell Callahan and Hugh Callahan (SE1/4 SW1/4, portion of Parcel 2);

(g)  Recorded April 10, 1943, Book 598, Page 491: City of El Centro, County of Imperial, et al. to the United States of America (Parcel 1 and portion of Parcel 2);

(h)  Recorded July 10, 1944, Book 622, Page 172: Genevieve C. Norton, et al. to the United States of America (Tract 156, portion of Parcel 2—the adjoining tract);

(i)  Recorded June 4, 1945, Book 639, Page 521: A. B. Evans and Mary Pearl Evans to the Imperial Irrigation District (south 39 acres, Tract 157, portion of Parcel 2);

(j)  Recorded July 5, 1945, Book 644, Page 162, and re-recorded January 17, 1947, Book 670, Page 242: Wendell Callahan, et al. to the United States of America (portion of Parcel 2);

(k)  Recorded September 10, 1946, Book 663, Page 157: Imperial Irrigation District to Wendell Callahan (south 39 acres, Tract 157, portion of Parcel 2);

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

11

(l)  Recorded December 10, 1947, Book 688, Page 79: Imperial Irrigation District to the United States of America (portion of Parcel 2);

(m)  Recorded October 15, 1952, Book 846, Page 492: Imperial Irrigation District to Wendell Callahan (south 39 acres, Tract 157, portion of Parcel 2); and

(n)  Recorded October 15, 1952, Book 846, Page 493: Wendell Callahan to the United States of America (south 39 acres, Tract 157, portion of Parcel 2).

26.    The recorded chain thus shows: County tax-title involvement with the Property in 1931 and 1936; the 1939 conveyance to Albert Evans; the April 10, 1943 conveyance by the City of El Centro and the County of Imperial, among others, to the United States; and a series of post-dispossession paper transfers of the Evans parcel itself (1945, 1946, and 1952) culminating in the United States—with no eminent domain proceeding, no condemnation judgment, declaration of taking, recorded compensation receipt, or acquisition record reflecting payment to Albert Evans has been located in the title materials currently available to Plaintiff. The December 26, 1941 instrument does not, on its face, identify A.B. Evans as grantor. It does, however, record a same-day conveyance from the Imperial Irrigation District to the County of Imperial affecting portions of the same broader parcel framework described in the Guarantee, and it was recorded on the very date the Evans family alleges Albert Evans was forcibly dispossessed. Plaintiff alleges that this same-day record forms part of the land-assembly mechanism for the wartime air-station project.

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

12

27.   An instrument recorded June 4, 1945 (Book 639, Page 521), reflects a conveyance from A. B. Evans and Mary Pearl Evans to the Imperial Irrigation District covering the same south 39 acres. A June 4, 1945 instrument reflects a conveyance from A.B. Evans and Mary Pearl Evans to the Imperial Irrigation District covering the south 39 acres of Tract 157. Plaintiff does not presently possess the complete instrument, consideration record, closing file, or acquisition correspondence. Plaintiff alleges on information and belief, based on the prior physical dispossession, the absence of any recorded condemnation judgment, the absence of any recorded compensation evidence, and family accounts, that the 1945 instrument did not represent a voluntary, fully compensated market transaction. Plaintiff will seek the underlying instrument and acquisition records in discovery.

28.   Plaintiff is informed and believes, and on that basis alleges, that the practical effect of the recorded chain—under which the Evans parcel was paper-transferred through the Imperial Irrigation District and a private intermediary to the United States, while the County's accessible indices did not associate Albert Evans's name with Tract 157 in any manner discoverable through ordinary inquiry—was to render Albert Evans's recorded ownership effectively undiscoverable to his descendants without a professional title search.

**F.  The County's Denials and the Suppressed Accessibility of the Records**

29.   Following the taking, County officials falsely represented to Albert Evans and, later, to members of the Evans family that Albert Evans had never owned property in Imperial County. These denials were made orally when family members contacted County offices—including the Imperial County Assessor's office—to inquire about the

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

13

Property and Albert Evans's prior ownership. Specifically, and as further alleged in paragraph 35 below, Plaintiff's father and his brothers made in-person inquiries at the Imperial County Assessor's office on multiple occasions over the years and were told, in substance, that the family did not own and had never owned property in Imperial County.

30.     County property records were maintained in a manner that suppressed Albert Evans's name and ownership interest, including by referencing the parcel under tract designations ("Tract 157") without associating Albert Evans as a prior owner in the County assessor or recorder indices accessible to members of the public or to heirs making informal inquiries.

31.     In or about 2022, during Plaintiff's in-person inquiry at the Imperial County Assessor's office (alleged in paragraph 35(d) below), the County official with whom Plaintiff spoke told Plaintiff, in substance, that the State of California had sued the County of Imperial in or about 1960 or 1961 because the County could not accurately identify property owners and had not maintained accurate property-ownership records. Plaintiff alleges, on information and belief based upon that statement by a County official, that such litigation occurred and that it corroborates the County's longstanding failure to maintain accurate and accessible ownership records for the period encompassing Albert Evans's ownership.

**G.  The Evans Family's Efforts, 1941 Through 2022**

32.     Albert Evans did not abandon his claim to the Property or acquiesce in the taking. Immediately upon eviction, he protested to the government officials present, as alleged in paragraph 20 above. In the days and weeks that followed, he made efforts to understand what had occurred, including asking persons in the local community—both

14

FIRST AMENDED COMPLAINT

Black and white—whether there was any recourse for what had been done to him. He received no meaningful assistance.

33.   In the years following the 1941 taking, Albert Evans was economically devastated by the loss of the Property and of the dairy operation he had built. He relocated his family and worked to rebuild a subsistence livelihood. He lacked the financial resources to retain an attorney to pursue a takings claim, and, even had he possessed such resources, the racial climate in Imperial County in the 1940s—including the near-total exclusion of African Americans from access to the civil justice system on an equal basis—made the prospect of pursuing a constitutional claim against the County of Imperial effectively impossible.

34.   Albert Evans spoke with members of his family, including his wife and children, about the taking of the Property throughout his lifetime. He described the government officials who had come to the Property in December 1941, the 48-hour ultimatum, and his conviction that the land had been stolen from the family. He consistently maintained, until his death in December 1965, that the family had owned the land and had never been paid. These oral accounts were passed down within the family, and members of the family—including several of Albert Evans's sons, a number of whom served in the United States military—supported his efforts to assert the family's claim to the Property.

35.   To the best of Plaintiff's present knowledge, following his own investigation and interviews of surviving family members, the Evans family's efforts across the decades were as follows:

15

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

(a)  1941: Albert Evans protested in person on December 26, 1941, at the Property, to the officials carrying out the dispossession, asserting his ownership and the absence of any payment (paragraph 20 above), and in the days and weeks that followed sought help in the local community without success (paragraph 32 above).

(b)  1940s through Albert Evans's death in December 1965: Albert Evans continued throughout his lifetime to assert, within his family and community, that the land was his and had been taken without payment. During this period, members of the family—including, on information and belief, Plaintiff's father, Robert Evans, and his brothers—began making in-person inquiries at the Imperial County Assessor's office regarding the family's ownership; on each occasion, County personnel responded, in substance, that the family did not own and had never owned property in Imperial County.

(c)  Subsequent decades: Plaintiff's father and his brothers repeated such inquiries at the Imperial County Assessor's office over the years and were met with the same denials. Plaintiff does not presently know the precise year of each such inquiry: the family members who made them are deceased or elderly, and the County's denials themselves deprived the family of any record from which dates could now be fixed.

(d)  In or about 2022: Plaintiff personally traveled to Imperial County and, with the assistance of a real estate agent, searched for County records of Albert Evans's ownership. The only record locatable in Albert Evans's

16

name was the recorded ditch-bank easement described in paragraph 14 above. Plaintiff presented a copy of that easement in person at the Imperial County Assessor's office to a County official whose surname Plaintiff recalls as "Minville" or a phonetically similar name. That official caused support staff to locate the easement and informed Plaintiff that it lay within the boundaries of Naval Air Facility El Centro; the same official told Plaintiff, in substance, that Albert Evans had never owned any land in Imperial County and that no such ownership was recorded; and the same official told Plaintiff of the 1960–1961 records litigation alleged in paragraph 31 above.

(e) 2022 through 2023: Following that denial, Plaintiff commissioned the professional chain-of-title search alleged in Section IV.H below, which for the first time produced objective documentary confirmation of the family's recorded ownership.

36. Because the County's own records custodians repeatedly represented that no record of Albert Evans's ownership existed, the family had no objective documentary basis upon which to retain counsel or to certify a good-faith pleading; the family reasonably relied on those official denials as accurately reflecting the contents of the County's records; and, in the decades closest to the taking, the conditions alleged in Section IV.D made any attempt by a Black family to sue the County of Imperial not merely impractical but dangerous.

37. Among the surviving family members with knowledge of this history are: Plaintiff's mother, Betty Jean Wallice, born in 1933, who grew up in the Imperial Valley

17

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

less than two miles from the Evans dairy, married into the Evans family in 1951, and personally knew Albert Evans, the family, and its dairy operation—her sworn declaration, executed June 9, 2026, is attached as Exhibit B and incorporated by reference; Plaintiff's cousin, Augustine Evans Jr., a grandson of Albert Evans who personally knew his grandfather and who has assembled the family's history of the ownership and loss of the land from family accounts and from his own research—his sworn declaration, executed June 9, 2026, is attached as Exhibit C and incorporated by reference; and Plaintiff's aunt, America Evans, a daughter of Albert Evans, now ninety years of age.

**H.  Plaintiff's Discovery of the Documentary Evidence — 2021 Through 2023**

38.    No member of the Evans family possessed objective, documentary confirmation of Albert Evans's recorded ownership of the Property until 2023, when the professional title search Plaintiff commissioned was completed.

39.    Plaintiff's investigation was prompted in part by increased public attention to historical, racially motivated property takings in California—including the widely publicized return of the Bruce's Beach property in Manhattan Beach, California, to the Bruce family in 2021–2022, and the proceedings concerning the displacement of Black and Mexican American families from the Palm Springs Section 14 area. These events caused Plaintiff to renew and intensify the family's longstanding effort to document what had happened to Albert Evans's land.

40.    Beginning in approximately 2022, Plaintiff conducted public-records searches, examined publicly available historical records, traveled personally to Imperial County, and engaged in title research concerning the Property—including the in-person County records search and Assessor's-office inquiry alleged in paragraph 35(d) above, in

18

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jjlegal.org

which the only record locatable in Albert Evans's name was the ditch-bank easement and in which a County official again denied that Albert Evans had ever owned land in the County. Following that denial, Plaintiff commissioned a professional chain-of-title search from First American Title Insurance Company at a personal cost of approximately $6,000. The search took approximately three weeks to complete.

41.    First American completed the search and issued the Guarantee, bearing a Date of Guarantee of March 30, 2023. The Guarantee provided, for the first time, objective documentary confirmation of: (a) the recorded August 10, 1939 conveyance to A. B. Evans (Book 529, Page 449); (b) the complete recorded chain set forth in paragraph 25 above, including the December 26, 1941, April 10, 1943, June 4, 1945, and October 15, 1952 entries; and (c) the absence of any recorded eminent domain judgment or condemnation proceeding as the basis for the government's acquisition of the Property.

42.    Plaintiff received and reviewed the Guarantee, and came to understand its contents and significance, in the period following its issuance. As Plaintiff stated in his May 31, 2024 claim correspondence, prior to July 2023 he had remained unaware of the existence of this documentary evidence. The Date of Guarantee—March 30, 2023—is the records-effective date stated on the face of the document.

43.    Prior to obtaining the Guarantee, neither Plaintiff nor, on information and belief, any descendant of Albert Evans possessed—or reasonably could have obtained through the inquiries actually made—objective documentary confirmation of Albert Evans's recorded ownership interest in the Property, because the County's officials affirmatively denied that any such record existed and the County's accessible indices did not associate his name with the Property.

**I.  Claims Presentation and Commencement of This Action**

44.     Plaintiff retained The Law Offices of James L. Arrasmith in or about May 2024. On May 31, 2024, written claims under the Government Claims Act, together with supplemental letters addressing late submission, were transmitted via certified mail on Plaintiff's behalf to: the State of California (addressed to the Office of the Governor, 1021 O Street, Suite 9000, Sacramento, California 95814); the County of Imperial (940 W. Main Street, El Centro, California 92243); the City of El Centro; and the Imperial Irrigation District.

45.     The City of El Centro acknowledged receipt of its claim on June 10, 2024, and issued a written Notice of Rejection of Claim on June 14, 2024. No Defendant named herein acted upon the claims within the time provided by Government Code section 912.4, and the claims were therefore denied or deemed denied by operation of law.

46.     No presentment was required for the claims maintained in this First Amended Complaint: under Government Code section 905.1, "[n]o claim is required to be filed to maintain an action against a public entity for taking of, or damage to, private property pursuant to Section 19 of Article I of the California Constitution," and claims under 42 U.S.C. § 1983 are not subject to state claim-presentation requirements. *Felder v. Casey*, 487 U.S. 131 (1988). The claims were nonetheless presented as alleged above.

47.     Plaintiff filed his initial Complaint in the Superior Court of California, County of Imperial (Case No. ECU003850), on December 3, 2024. On February 3, 2025, Defendant County of Imperial removed the action to this Court; that same day, Defendant the State of California, through the Office of the Attorney General, filed a general-denial Answer in the Superior Court. The procedural history of the removed action—including

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jjlegal.org

20

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

the March 28, 2025 dismissal, the February 5, 2026 order granting relief under Federal Rule of Civil Procedure 60(b) and reinstating the action, the reassignment of the action to this Court, and the Court's May 20, 2026 Order granting Plaintiff leave to amend (ECF No. 22)—is reflected in the docket. This First Amended Complaint is filed pursuant to that Order.

## V.  TIMELINESS: EQUITABLE ESTOPPEL, FRAUDULENT CONCEALMENT, DELAYED DISCOVERY, AND EQUITABLE TOLLING

48.    Plaintiff acknowledges the Court's May 20, 2026 Order holding that, under federal accrual principles, Plaintiff's claims under 42 U.S.C. § 1983 accrued in late December 1941, when government officials seized Albert Evans's land. Plaintiff pleads the following matters pursuant to the Court's grant of one opportunity to amend to allege specific and plausible facts supporting relief from the statute of limitations. Although federal law governs accrual of the § 1983 claims, California's tolling rules—including equitable estoppel, fraudulent concealment, and equitable tolling—apply to those claims. *Hardin v. Straub*, 490 U.S. 536 (1989); *Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004).

### A.  Equitable Estoppel by Affirmative Misrepresentation

49.    The wrong upon which Plaintiff sues is the uncompensated taking of December 1941. The conduct giving rise to equitable estoppel is separate, later, and above and beyond that wrong: over the decades following the taking, and continuing after Albert Evans's death in December 1965, officials of the County—the custodians of the very records at issue—affirmatively and falsely represented to Albert Evans's descendants, in response to their direct inquiries, that Albert Evans had never owned

21

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

property in Imperial County and that no record of any such ownership existed. (Paragraphs 29–31, 35.)

50.     Each element of equitable estoppel is satisfied as to the descendants whose inquiries were met with those denials. First, the County was apprised of the true facts: at all times it possessed the recorded instruments—including the deed recorded August 10, 1939, at Book 529, Page 449, and the chain set forth in paragraph 25—showing Albert Evans's ownership, and its records officials knew of or had ready access to those instruments. Second, the denials were made by records-custodian officials acting in their official capacities, in direct response to inquiries about those very records, under circumstances in which the family had a right to believe the denials were intended to be relied upon—and with the natural and probable effect of inducing the family to refrain from pursuing legal claims. Third, the persons asserting the estoppel—Albert Evans's descendants, including Plaintiff—were ignorant of the true state of the recorded facts: unlike Albert Evans himself with respect to the bare fact of the dispossession, the descendants did not know that recorded instruments existed confirming the family's ownership and confirming the absence of any condemnation proceeding, because the officials who controlled the records told them that no such records existed. Fourth, the descendants reasonably relied on those official denials in refraining from suit, because the denials came from the public officers with authority over the very records inquired about, and because the conditions alleged in Section IV.D made challenging those denials dangerous as well as futile. Although each descendant's claim is derivative of Albert Evans's, the persons who alone could have prosecuted those claims after his death in 1965 were precisely the persons to whom the false denials were made.

22

51.    The estoppel conduct is distinct from the cause of action itself: Plaintiff does not assert a cause of action for fraud or misrepresentation in this First Amended Complaint. The false "no records" representations are pleaded solely as grounds for estoppel and tolling, and they consist of conduct separate from, later than, and above and beyond the December 1941 taking upon which Plaintiff's causes of action are founded.

52.    Nor could the family, consistent with honesty, have certified a pleading alleging recorded ownership while the County's own records custodians were representing that no such records existed; and, in the decades closest to the taking, a Black family in the Imperial Valley could not have sued the County of Imperial without grave personal risk—a circumstance the Court has acknowledged may have made timely suit "difficult perhaps even impossible."

**B.  Fraudulent Concealment**

53.    Separately and in addition, the County fraudulently concealed the documentary basis of the claims alleged herein through conduct above and beyond the underlying taking, with the following particulars: (a) the false representations were that Albert Evans "never owned property in Imperial County" and that no such ownership "was recorded"; (b) they were made orally, at the Imperial County Assessor's office, by County records personnel who knew of or had ready access to the true recorded facts; (c) they were made to Plaintiff's father, Robert Evans, and his brothers on multiple occasions over the years (paragraphs 29, 35(b)–(c)), and to Plaintiff personally in or about 2022 by an Assessor's-office official whose surname Plaintiff recalls as "Minville" or a phonetically similar name (paragraph 35(d)); and (d) the County simultaneously

23

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

maintained its accessible indices in a manner that did not associate Albert Evans's name with Tract 157 (paragraphs 28, 30).

54.    The running of the limitations period was thereby tolled until 2023, when Plaintiff obtained the Guarantee—the first objective documentary confirmation that the County's denials were false. Plaintiff thereafter acted promptly: written claims were transmitted on May 31, 2024, and this action was filed on December 3, 2024.

**C.  Delayed Discovery (Preserved)**

55.    In the alternative, and to preserve the contention for any further review, Plaintiff continues to assert that accrual of his claims should be measured from the 2023 discovery of the recorded instruments under the delayed-discovery rule. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807–08 (2005). Plaintiff acknowledges the Court's contrary ruling in its May 20, 2026 Order. As required by *McKelvey v. Boeing North American, Inc.*, 74 Cal. App. 4th 151, 160 (1999), Plaintiff pleads the time and manner of discovery (paragraphs 40–42) and the inability to have made earlier discovery despite reasonable diligence (paragraphs 28–37, 43).

**D.  Equitable Tolling**

56.    Also in the alternative, the statute of limitations is equitably tolled. First, as to timely notice—which Plaintiff acknowledges the Court has held "ought to be interpreted literally"—Albert Evans's December 26, 1941 protest, made in person at the Property to the officials carrying out the seizure and asserting his ownership and the absence of any payment (paragraph 20), constituted notice, within days of accrual and within any applicable limitations period, of the family's claim that the land was being taken without compensation. Second, as to lack of prejudice, the County has at all times

24

created, maintained, and controlled the official property records upon which Plaintiff's claims and the County's defenses alike depend, and the County's own recorded instruments document its participation in the wartime land assembly (paragraphs 23, 25–26); the core documentary evidence has therefore remained continuously in the County's custody. Third, Plaintiff and his predecessors acted reasonably and in good faith, as alleged in Sections IV.D and IV.F through IV.H and in Parts A and B of this Section.

57.   Additionally, the modern Government Claims Act was enacted in 1963 and did not exist at the time of the taking in 1941, and Albert Evans therefore could not have complied with its presentment requirements at the time of accrual. As alleged in paragraph 46, no presentment was required for the claims maintained in this First Amended Complaint; the claims were nonetheless presented as alleged in paragraphs 44 through 45.

### VI.  CAUSES OF ACTION
### FIRST CAUSE OF ACTION
**Inverse Condemnation — U.S. Const. amends. V, XIV; Cal. Const. art. I, § 19**
**(Against All Defendants)**

58.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth above. The First Cause of Action is asserted against the County and Doe defendants under the Fifth and Fourteenth Amendments and against the State of California only as a preserved California constitutional inverse-condemnation claim under Article I, section 19, subject to remand or dismissal without prejudice if this Court determines that Eleventh Amendment immunity prevents adjudication of that claim in this federal forum.

59.   Defendants took the real property of Plaintiff's predecessor in interest, Albert Evans—the approximately 39 acres constituting the south 39 acres of Tract 157,

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

25

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

associated with 2024 Bennett Road, El Centro, California—for public use, namely the wartime military project that became Naval Air Facility El Centro, without paying just compensation, in violation of the Takings Clause of the Fifth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, and of Article I, Section 19 of the California Constitution.

60.   No eminent domain proceeding was initiated or completed. No compensation of any kind was paid to Albert Evans or to his heirs. The taking was accomplished under threat of force.

61.   The right to just compensation under Article I, Section 19 of the California Constitution is self-executing, and no claim presentation was required to maintain this cause of action. Cal. Gov. Code § 905.1.

62.   Plaintiff, as a grandson, heir, and successor in interest of Albert Evans as alleged in Section III, is entitled to just compensation for the taking of the Property, in an amount to be determined according to proof at trial.

63.   As to Defendant the State of California, Plaintiff acknowledges the Court's observation in its May 20, 2026 Order regarding potential Eleventh Amendment immunity. The State's amenability to suit in this forum is addressed in Plaintiff's concurrently filed Response to the Order to Show Cause, and Plaintiff respectfully preserves the alternative of remand of the state-law component of this claim to the Superior Court pursuant to 28 U.S.C. § 1367(c) and *Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988), should the Court determine that it may not proceed against the State in this forum.

**SECOND CAUSE OF ACTION**
**Violation of Due Process — 42 U.S.C. § 1983**

26

**(Against Defendant County of Imperial and Does 1–50)**

64.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above. The County's liability arises from official County action, including recorded participation in the land-assembly chain, the December 26, 1941 County grantee instrument affecting the relevant parcel framework, the April 10, 1943 conveyance by the County and others to the United States, and subsequent records-custodian conduct by County offices that affirmatively denied the existence of Albert Evans's recorded ownership. Plaintiff alleges these acts were official acts, ratified by County decisionmakers, or carried out pursuant to County recordkeeping customs and practices. Plaintiff will seek the County Board of Supervisors minutes, resolutions, acquisition files, assessor indices, recorder indices, and related military-acquisition correspondence in discovery.

65.    Acting under color of state law, the County and the Doe defendants deprived Albert Evans of his property interest without any pre-deprivation notice, hearing, or opportunity to be heard, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

66.    The County and the Doe defendants further deprived Albert Evans and his heirs of any meaningful post-deprivation remedy by falsely denying, through the County's records officials, that Albert Evans had ever owned the Property, and by maintaining the County's accessible records and indices in a manner that prevented the Evans family from discovering the documentary basis for a legal claim, as alleged in Sections IV.E through IV.G above.

67.    These deprivations were acts of the County itself and were undertaken pursuant to official County policy, custom, or ratification by the County's final

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

27

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

policymakers, in that: (a) the County's role in the wartime acquisition is reflected in instruments recorded in its own Official Records, including the December 26, 1941 conveyance to the County (Book 582, Page 134) and the April 10, 1943 conveyance by the County of Imperial, the City of El Centro, and others to the United States (Book 598, Page 491)—official acts of the entity itself; (b) Plaintiff is informed and believes, and on that basis alleges, that the County's participation in the wartime land assembly, and the decision to take the Evans Property without process or compensation while affording formal acquisition procedures to non-minority owners, were directed, authorized, or ratified by the County's final policymaking authority, its Board of Supervisors; and (c) the decades-long pattern of denials by County records personnel alleged above reflects a custom and practice of the County's records offices.

68.    As a direct and proximate result of these constitutional violations, Plaintiff, as heir and successor in interest of Albert Evans, has suffered damages in an amount to be proved at trial, including the value of the Property and the loss of its use and enjoyment. Plaintiff seeks all available remedies under 42 U.S.C. § 1983, including compensatory damages, and attorney's fees pursuant to 42 U.S.C. § 1988.

### THIRD CAUSE OF ACTION
#### Denial of Equal Protection — 42 U.S.C. § 1983
#### (Against Defendant County of Imperial and Does 1–50)

69.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above.

70.    The taking of Albert Evans's property was motivated in substantial part by his race. Albert Evans was targeted for summary eviction without process or compensation because he was an African American landowner, during a period in which

28

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

government entities routinely denied to Black citizens the rights and remedies afforded to white citizens.

71.     On information and belief, non-minority landowners in the same vicinity whose property was acquired for the same wartime project during the same period received notice, formal acquisition proceedings, and compensation of approximately $3,000 each, while Albert Evans received nothing. This allegation is based upon, among other things, family accounts and documentation Plaintiff has provided to counsel, including a court order reflecting payments to a white family and a Mexican American family whose land lay in the area of the present installation. The recorded chain is consistent with the use of formal acquisitions from neighboring owners: for example, the owners of adjoining Tract 156, the Norton family, conveyed that tract to the United States by instrument recorded July 10, 1944 (Book 622, Page 172).

72.     By taking Albert Evans's property without notice, process, or compensation on account of his race, while affording notice, process, and compensation to similarly situated non-minority landowners, the County and the Doe defendants denied Albert Evans the equal protection of the laws guaranteed by the Fourteenth Amendment, actionable through 42 U.S.C. § 1983. These acts were undertaken pursuant to the County policy, custom, and ratification alleged in paragraph 67.

73.     Plaintiff seeks all available remedies under 42 U.S.C. § 1983, including compensatory damages, and attorney's fees pursuant to 42 U.S.C. § 1988.

**FOURTH CAUSE OF ACTION**
**Declaratory Relief — 28 U.S.C. §§ 2201–2202**
**(Against All Defendants)**

74.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth above.

29

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

75.    An actual controversy exists between Plaintiff and Defendants concerning the rights, duties, and obligations arising from the taking of Albert Evans's property and the parties' respective legal positions. Plaintiff seeks a judicial declaration that: (a) Albert Evans was the lawful owner of the approximately 39-acre Property at the time of its seizure in December 1941; (b) no eminent domain proceeding was conducted, and no compensation was paid, in connection with the taking of the Property; and (c) Plaintiff, as an heir and successor in interest of Albert Evans, holds a cognizable legal interest in compensation for the taking of the Property.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff ROBERT EVANS respectfully prays for judgment against Defendants as follows:

(a)  For compensatory damages in an amount to be proved at trial, including just compensation measured by the value of the Property, together with interest as permitted by law, and all consequential and special damages;

(b)  For a declaration that Albert Evans was the lawful owner of the Property at the time of its seizure in December 1941, that the seizure was effected without due process of law and without just compensation, and that Plaintiff holds a cognizable legal interest as an heir and successor in interest of Albert Evans;

(c)  For restitution and such further equitable relief as the Court deems appropriate, including compensation in lieu of title;

30

(d)  For attorney's fees pursuant to 42 U.S.C. § 1988 and any other applicable provision of law;

(e)  For costs of suit incurred herein; and

(f)  For such other and further relief as the Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff ROBERT EVANS hereby demands a trial by jury on all claims and issues so triable.

**Dated:** June 10, 2026

**THE LAW OFFICES OF JAMES L. ARRASMITH**

By: *James L. Arrasmith*
James L. Arrasmith
Attorney for Plaintiff, *ROBERT EVANS*

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

31

**INDEX OF EXHIBITS**

A.  Chain of Title Guarantee No. 5013500-0623-6966330, First American Title Insurance Company (Date of Guarantee: March 30, 2023).

B.  Declaration of Betty Jean Wallice (executed June 9, 2026).

C.  Declaration of Augustine Evans Jr. (executed June 9, 2026).

D.  Certified-Mail Receipts and Article Numbers for Each May 31, 2024 Government Tort Claim Mailing

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

FIRST AMENDED COMPLAINT

# EXHIBIT A



| | Chain of Title Guarantee |
|---|---|
| **Guarantee** | ISSUED BY<br>**First American Title Insurance Company**<br>GUARANTEE NUMBER<br>**5013500-0623-6966330** |

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE LIMITS OF LIABILITY AND THE CONDITIONS AND STIPULATIONS OF THIS GUARANTEE,

**FIRST AMERICAN TITLE INSURANCE COMPANY**
a Nebraska corporation, herein called the Company

**GUARANTEES**

the Assured named in Schedule A against actual monetary loss or damage not exceeding the liability stated in Schedule A, which the Assured shall sustain by reason of any incorrectness in the assurances set forth in Schedule A.

**First American Title Insurance Company**

Kenneth D. DeGiorgio, President

Lisa W. Cornehl, Secretary

## SCHEDULE OF EXCLUSIONS FROM COVERAGE OF THIS GUARANTEE

1. Except to the extent that specific assurances are provided in Schedule A of this Guarantee, the Company assumes no liability for loss or damage by reason of the following:
   (a) Defects, liens, encumbrances, adverse claims or other matters against the title, whether or not shown by the public records.
   (b) (1) Taxes or assessments of any taxing authority that levies taxes or assessments on real property; or, (2) Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not the matters excluded under (1) or (2) are shown by the records of the taxing authority or by the public records.
   (c) (1) Unpatented mining claims; (2) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (3) water rights, claims or title to water, whether or not the matters excluded under (1), (2) or (3) are shown by the public records.

2. Notwithstanding any specific assurances which are provided in Schedule A of this Guarantee, the Company assumes no liability for loss or damage by reason of the following:
   (a) Defects, liens, encumbrances, adverse claims or other matters affecting the title to any property beyond the lines of the land expressly described in the description set forth in Schedule (A), (C) or in Part 2 of this Guarantee, or title to streets, roads, avenues, lanes, ways or waterways to which such land abuts, or the right to maintain therein vaults, tunnels, ramps or any structure or improvements; or any rights or easements therein, unless such property, rights or easements are expressly and specifically set forth in said description.
   (b) Defects, liens, encumbrances, adverse claims or other matters, whether or not shown by the public records; (1) which are created, suffered, assumed or agreed to by one or more of the Assureds; (2) which result in no loss to the Assured; or (3) which do not result in the invalidity or potential invalidity of any judicial or non-judicial proceeding which is within the scope and purpose of the assurances provided.
   (c) The identity of any party shown or referred to in Schedule A.
   (d) The validity, legal effect or priority of any matter shown or referred to in this Guarantee.

### GUARANTEE CONDITIONS AND STIPULATIONS

1. **Definition of Terms.**
   The following terms when used in the Guarantee mean:
   (a) the "Assured": the party or parties named as the Assured in this Guarantee, or on a supplemental writing executed by the Company.
   (b) "land": the land described or referred to in Schedule (A)(C) or in Part 2, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule (A)(C) or in Part 2, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways.
   (c) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.
   (d) "public records": records established under state statutes at Date of Guarantee for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge.
   (e) "date": the effective date.

2. **Notice of Claim to be Given by Assured Claimant.**
   An Assured shall notify the Company promptly in writing in case knowledge shall come to an Assured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as stated herein, and which might cause loss or damage for which the Company may be liable by virtue of this Guarantee. If prompt notice shall not be given to the Company, then all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any Assured unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

3. **No Duty to Defend or Prosecute.**
   The Company shall have no duty to defend or prosecute any action or proceeding to which the Assured is a party, notwithstanding the nature of any allegation in such action or proceeding.

4. **Company's Option to Defend or Prosecute Actions; Duty of Assured Claimant to Cooperate.**
   Even though the Company has no duty to defend or prosecute as set forth in Paragraph 3 above:
   (a) The Company shall have the right, at its sole option and cost, to institute and prosecute any action or proceeding, interpose a defense, as limited in (b), or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest as stated herein, or to establish the lien rights of the Assured, or to prevent or reduce loss or damage to the Assured. The Company may take any appropriate action under the terms of this Guarantee, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this Guarantee. If the Company shall exercise its rights under this paragraph, it shall do so diligently.
   (b) If the Company elects to exercise its options as stated in Paragraph 4(a) the Company shall have the right to select counsel of its choice (subject to the right of such Assured to object for reasonable cause) to represent the Assured and shall not be liable for and will not pay the fees of any other counsel, nor will the Company pay any fees, costs or expenses incurred by an Assured in the defense of those causes of action which allege matters not covered by this Guarantee.
   (c) Whenever the Company shall have brought an action or interposed a defense as permitted by the provisions of this Guarantee, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from an adverse judgment or order.
   (d) In all cases where this Guarantee permits the Company to prosecute or provide for the defense of any action or proceeding, an Assured shall secure to the Company the right to so prosecute or provide for the defense of any action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of

such Assured for this purpose. Whenever requested by the Company, an Assured, at the Company's expense, shall give the Company all reasonable aid in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest as stated herein, or to establish the lien rights of the Assured. If the Company is prejudiced by the failure of the Assured to furnish the required cooperation, the Company's obligations to the Assured under the Guarantee shall terminate.

5. **Proof of Loss or Damage.**

In addition to and after the notices required under Section 2 of these Conditions and Stipulations have been provided to the Company, a proof of loss or damage signed and sworn to by the Assured shall be furnished to the Company within ninety (90) days after the Assured shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the matters covered by this Guarantee which constitute the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the Assured to provide the required proof of loss or damage, the Company's obligation to such assured under the Guarantee shall terminate. In addition, the Assured may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Guarantee, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Assured shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the Assured provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Assured to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in the above paragraph, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this Guarantee to the Assured for that claim.

6. **Options to Pay or Otherwise Settle Claims: Termination of Liability.**

In case of a claim under this Guarantee, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Liability or to Purchase the Indebtedness.

The Company shall have the option to pay or settle or compromise for or in the name of the Assured any claim which could result in loss to the Assured within the coverage of this Guarantee, or to pay the full amount of this Guarantee or, if this Guarantee is issued for the benefit of a holder of a mortgage or a lienholder, the Company shall have the option to purchase the indebtedness secured by said mortgage or said lien for the amount owing thereon, together with any costs, reasonable attorneys' fees and expenses incurred by the Assured claimant which were authorized by the Company up to the time of purchase. Such purchase, payment or tender of payment of the full amount of the Guarantee shall terminate all liability of the Company hereunder. In the event after notice of claim has been given to the Company by the Assured the Company offers to purchase said indebtedness, the owner of such indebtedness shall transfer and assign said indebtedness, together with any collateral security, to the Company upon payment of the purchase price. Upon the exercise by the Company of the option provided for in Paragraph (a) the Company's obligation to the Assured under this Guarantee for the claimed loss or damage, other than to make the payment required in that paragraph, shall terminate, including any obligation to continue the defense or prosecution of any litigation for which the Company has exercised its options under Paragraph 4, and the Guarantee shall be surrendered to the Company for cancellation.

(b) To Pay or Otherwise Settle With Parties Other Than the Assured or With the Assured Claimant.

To pay or otherwise settle with other parties for or in the name of an Assured claimant any claim assured against under this Guarantee, together with any costs, attorneys' fees and expenses incurred by the Assured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of the option provided for in Paragraph (b) the Company's obligation to the Assured under this Guarantee for the claimed loss or damage, other than to make the payment required in that paragraph, shall terminate, including any obligation to continue the defense or prosecution of any litigation for which the Company has exercised its options under Paragraph 4.

7. **Determination and Extent of Liability.**

This Guarantee is a contract of Indemnity against actual monetary loss or damage sustained or incurred by the Assured claimant who has suffered loss or damage by reason of reliance upon the assurances set forth in this Guarantee and only to the extent herein described, and subject to the Exclusions From Coverage of This Guarantee. The liability of the Company under this Guarantee to the Assured shall not exceed the least of:

(a) the amount of liability stated in Schedule A or in Part 2;

(b) the amount of the unpaid principal indebtedness secured by the mortgage of an Assured mortgagee, as limited or provided under Section 6 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage assured against by this Guarantee occurs, together with interest thereon; or

(c) the difference between the value of the estate or interest covered hereby as stated herein and the value of the estate or interest subject to any defect, lien or encumbrance assured against by this Guarantee.

8. **Limitation of Liability.**

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures any other matter assured against by this Guarantee in a reasonably diligent manner by any method, including

**GUARANTEE CONDITIONS AND STIPULATIONS (Continued)**

litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title, as stated herein.

(c) The Company shall not be liable for loss or damage to any Assured for liability voluntarily assumed by the Assured in settling any claim or suit without the prior written consent of the Company.

**9. Reduction of Liability or Termination of Liability.**
All payments under this Guarantee, except payments made for costs, attorneys' fees and expenses pursuant to Paragraph 4 shall reduce the amount of liability pro tanto.

**10. Payment of Loss.**

(a) No payment shall be made without producing this Guarantee for endorsement of the payment unless the Guarantee has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within thirty (30) days thereafter.

**11. Subrogation Upon Payment or Settlement.**
Whenever the Company shall have settled and paid a claim under this Guarantee, all right of subrogation shall vest in the Company unaffected by any act of the Assured claimant. The Company shall be subrogated to and be entitled to all rights and remedies which the Assured would have had against any person or property in respect to the claim had this Guarantee not been issued. If requested by the Company, the Assured shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The Assured shall permit the Company to sue, compromise or settle in the name of the Assured and to use the name of the Assured in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the Assured the Company shall be subrogated to all rights and remedies of the Assured after the Assured shall have recovered its principal, interest, and costs of collection.

**12. Arbitration.**
Unless prohibited by applicable law, either the Company or the Assured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Assured arising out of or relating to this Guarantee, any service of the Company in connection with its issuance or the breach of a Guarantee provision or other obligation. All arbitrable matters when the Amount of Liability is $2,000,000 or less shall be arbitrated at the option of either the Company or the Assured. All arbitrable matters when the amount of liability is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Assured. The Rules in effect at Date of Guarantee shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permits a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

**13. Liability Limited to This Guarantee; Guarantee Entire Contract.**

(a) This Guarantee together with all endorsements, if any, attached hereto by the Company is the entire Guarantee and contract between the Assured and the Company. In interpreting any provision of this Guarantee, this Guarantee shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, or any action asserting such claim, shall be restricted to this Guarantee.

(c) No amendment of or endorsement to this Guarantee can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

**14. Notices, Where Sent.**
All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this Guarantee and shall be addressed to the Company at **First American Title Insurance Company, Attn: Claims National Intake Center, 1 First American Way, Santa Ana, California 92707. Claims.NIC@firstam.com Phone: 888-632-1642 Fax: 877-804-7606**



First American Title



# Chain of Title Guarantee

ISSUED BY

**First American Title Insurance Company**

GUARANTEE NUMBER
**0623-6966330**

# Schedule A

File No.: 0623-6966330          Liability: $4,800.00          Fee: $4,800.00

1.    Name of Assured: Robert Evans

2.    Date of Guarantee: March 30, 2023 at 7:30 A.M.

The assurances referred to on the face page are:

That, according to those public records which, under the recording laws, impart constructive notice of matters relating to the interest, if any, which was (acquired) (reserved) by United States of America

pursuant to a various documents of record in and to the land described as follows:

Real Property in the unincorporated area of the County of Imperial, State of California, described as follows:

PARCEL 1: (APN: 062-070-025-000)

LOTS 3, 4, 5, 6, 7, 12 AND 13 AND THE NORTHEAST ¼ OF THE SOUTHWEST ¼, ALL IN SECTION 30, TOWNSHIP 15 SOUTH, RANGE 13 EAST, SAN BERNARDINO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF IMPERIAL, STATE OF CALIFORNIA, AS PER MAP OF THE UNITED STATES GOVERNMENT RE-SURVEY APPROVED MARCH 15, 1909, FILED IN THE UNITED STATES LAND OFFICE.

PARCEL 2: (APN: 062-070-026-000)

TRACT 156 AND THE SOUTH 39 ACRES OF TRACT 157 IN SECTION 30, TOWNSHIP 15 SOUTH, RANGE 13 EAST, SAN BERNARDINO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF IMPERIAL, STATE OF CALIFORNIA, AS PER MAP OF THE UNITED STATES GOVERNMENT RE-SURVEY APPROVED MARCH 15, 1909, FILED IN THE UNITED STATES LAND OFFICE.

LOT'S 10 AND 14 IN SECTION 30, TOWNSHIP 15 SOUTH, RANGE 13 EAST, SAN BERNARDINO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF IMPERIAL, STATE OF CALIFORNIA, AS PER MAP OF THE UNITED STATES GOVERNMENT RE-SURVEY APPROVED MARCH 15, 1909, FILED IN THE UNITED STATES LAND OFFICE.

EXCEPTING THEREFROM LOTS 10 AND 14 ANY PORTION THEREOF LYING SOUTHERLY OF THE SOUTHERLY BOUNDARY OF TRACT 156.

THE SOUTHEAST ¼ OF THE SOUTHWEST ¼ IN SECTION 30, TOWNSHIP 15 SOUTH, RANGE 13 EAST, SAN BERNARDINO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF IMPERIAL, STATE OF CALIFORNIA, AS PER MAP OF THE UNITED STATES GOVERNMENT RE-SURVEY APPROVED MARCH 15, 1909, FILED IN THE UNITED STATES LAND OFFICE.

NOTE: THE ABOVE DESCRIPTION FOR PARCELS 1 AND 2 IS FOR IDENTIFICATION PURPOSES ONLY

AND HAS BEEN PROVIDED FOR THE ACCOMMODATION OF THIS GUARANTEE. SAID DESCRIPTION IS NOT INSURABLE PURSUANT TO THE SUBDIVISION MAP ACT OF THE STATE OF CALIFORNIA AND SHOULD NOT BE RELIED UPON TO CONVEY OR ENCUMBER SAID LAND.

IT HAS BEEN SHOWN AS SUCH SOLELY FOR THE PURPOSE OF FACILITATING A GUARANTEE ON ASSESSOR'S PARCEL NUMBER'S 062-070-025-000 AND 062-070-026-000 ONLY.

Only the following matters appear in such records subsequent to: January 1, 1930

1.  A document recorded January 21, 1930 in Book 263, Page 150 of Official Records.

    From: Pierre Claverie and Anna Claverie, husband and wife
    To: A. O. Spencer and Esther J.J. Spencer, husband and wife

    (Affects Lots 3, 12, 13, 14, East 1/2 Southwest 1/4, Portions of Parcels 1 and 2)

2.  A document recorded February 30, 1930 in Book 268, Page 101 of Official Records.

    From: Imperial Irrigation District
    To: George W. Damron

    (Affects Lots 4, 5, 6, 7, Portions of Parcel 1)

3.  A document recorded February 30, 1930 in Book 268, Page 102 of Official Records.

    From: Laura A. Damron, a single woman
    To: A. C. Burch

    (Affects Lots 4, 5, 6, 7, Portions of Parcel 1)

4.  A document recorded May 22, 1931 in Book 313, Page 96 of Official Records.

    From: Grable-Francisco Bleifuss Co., a corporation
    To: C.E. Walker and Minnie A. Walker, husband and wife as joint tenants

    (Affects Lots 3, 12, 13, 14, East 1/2 Southwest 1/4, Portions of Parcels 1 and 2)

5.  A document recorded May 23, 1932 in Book 333, Page 535 of Official Records.

    From: C.E. Walker and Minnie A. Walker, husband and wife
    To: Max Naumann

    (Affects Lots 3, 12, 13, 14, East 1/2 Southwest 1/4, Portions of Parcels 1 and 2)

6.    A document recorded December 1, 1932 in Book 342, Page 290 of Official Records.

From:        Max Naumann and Jospehine Naumann, husband and wife
To:          Leo J. Demers and Mildred C. Demers, husband and wife


(Affects Lots 3, 12, 13, 14, East 1/2 Southwest 1/4, Portions of Parcels 1 and 2)


7.    A document recorded March 2, 1934 in Book 375, Page 112 of Official Records.

From:        Imperial Irrigation District
To:          Imperial Irrigation District of El Centro


(Affects Lots 4 and 7, Portions of Parcel 1)


8.    A document recorded March 2, 1934 in Book 375, Page 113 of Official Records.

From:        Imperial Irrigation District
To:          Imperial Irrigation District of El Centro


(Affects Lots 5 and 6, Portions of Parcel 1)


9.    A document recorded August 21, 1935 in Book 424, Page 195 of Official Records.

From:        Tax Collector County Imperial
To:          State of California


(Affects Lots 4, 5, 6, 7, Portions of Parcel 1)


10.   A document recorded January 8, 1936 in Book 415, Page 536 of Official Records.

From:        Leo J. Demers and Mildred C. Demers, husband and wife
To:          Eva J. Essery


(Affects Lots 3, 12, 13, 14, East 1/2 Southwest 1/4, Portions of Parcels 1 and 2)


11.   A document recorded January 8, 1936 in Book 415, Page 537 of Official Records.

From:        M. R. Essery and Eva I. Essery, husband and wife
To:          Bank of America National Trust and Savings Association


(Affects Lots 3, 12, 13, 14, East 1/2 Southwest 1/4, Portions of Parcels 1 and 2)


12.   A document recorded May 23, 1936 in Book 429, Page 299 of Official Records.

From:        Bank of America National Trust and Savings Association
To:          R. C. Groner


(Affects Lots 3, 12, 13, 14, East 1/2 Southwest 1/4, Portions of Parcels 1 and 2)

13.    A document recorded July 10, 1931 in Book 316, Page 172 of Official Records.

    From:        Tax Collector County Imperial
    To:          State of California

    (Affects South 39 AC. Tract 157, Portion Parcel 2)

14.    A document recorded August 2, 1935 in Book 377, Pages 82 through 86 of Official Records.

    From:        Imperial Irrigation District
    To:          Imperial Irrigation District of El Centro, California

    (Affects South 39 AC. Tract 157, Portion Parcel 2)

15.    A document recorded June 4, 1936 in Book 429, Page 561 of Official Records.

    From:        Tax Collector County Imperial
    To:          Imperial Irrigation District

    (Affects South 39 AC. Tract 157, Portion Parcel 2)

16.    A document recorded August 15, 1938 in Book 512, Page 84 of Official Records.

    From:        Tax Collector County Imperial
    To:          State of California

    (Affects Lots 3, 12, 13, 14, East 1/2 Southwest 1/4, Portions of Parcels 1 and 2)

17.    A document recorded April 26, 1939 in Book 528, Pages 167 and 168 of Official Records.

    From:        Tax Collector Imperial Irrigation District
    To:          Imperial Irrigation District

    (Affects Lots 3, 12, 13, 14, East 1/2 Southwest 1/4, Portions of Parcels 1 and 2)

18.    A document recorded August 10, 1939 in Book 529, Page 449 of Official Records.

    From:        Imperial Irrigation District
    To:          A. B. Evans

    (Affects South 39 Acres Tract 157 Portion Parcel 2)

19.    A document recorded October 18, 1939 in Book 533, Page 552 of Official Records.

    From:        R. C. Groner etal.
    To:          Imperial Irrigation District

    (Affects Lots 3, 12, 13, 14, East 1/2 Southwest 1/4, Portions of Parcels 1 and 2)

20. A document recorded August 23, 1941 in Book 573, Page 459 of Official Records and recorded December 12, 1941 in Book 581, Page 241 of Official Records.

| | |
|---|---|
| From: | A. C. Burch Etal. |
| To: | Imperial Irrigation District |

(Affects Lots 4, 5, 6, 7 Portion Parcel 1)

21. A document recorded December 26, 1941 in Book 582, Page 134 of Official Records.

| | |
|---|---|
| From: | Imperial Irrigation District |
| To: | The County of Imperial |

(Affects Lots 3, 4, 5, 6, 7, 12, 13, N1/2 E1/2 SW1/4, Portions of Parcels 1 and 2)

22. A document recorded July 8, 1942 in Book 590, Page 208 of Official Records.

| | |
|---|---|
| From: | John Norton (Deceased) |
| To: | Genevieve C. Norton, a widow |

(Affects Tract 156, Portion Parcel 2)

23. A document recorded July 8, 1942 in Book 590, Page 210 of Official Records.

| | |
|---|---|
| From: | Genevieve C. Norton, a widow and Sarah Case AKA Sarah M. Case and Sadie M. Case, a single woman |
| To: | Genevieve C. Norton, a widow and Sarah M. Case, a single woman, as joint tenants |

(Affects Tract 156, Portion Parcel 2)

24. A document recorded October 2, 1942 in Book 595, Page 7 of Official Records.

| | |
|---|---|
| From: | Imperial Irrigation District |
| To: | Wendell Callahan and Hugh Callahan |

(Affects SE 1/4 SW 1/4, Portion Parcel 2)

25. A document recorded April 10, 1943 in Book 598, Page 491 of Official Records.

| | |
|---|---|
| From: | City of El Centro, County of Imperial etal. |
| To: | United States of America |

(Affects Parcel 1 and Portion Parcel 2)

26. A document recorded July 10, 1944 in Book 622, Page 172 of Official Records.

| | |
|---|---|
| From: | Genevieve C. Norton etal. |
| To: | United States of America |

(Affects Tract 156, Portion of Parcel 2)

27.   A document recorded June 4, 1945 in Book 639, Page 521 of Official Records.

      From:        A.B. Evans and Mary Pearl Evans
      To:          Imperial Irrigation District


      (Affects South 39 Acres Tract 157 Portion Parcel 2)

28.   A document recorded July 5, 1945 in Book 644, Page 162 of Official Records and recorded January 17, 1947 in Book 670, Page 242 of Official Records.

      From:        Wendell Callahan etal.
      To:          United States of America


      (Affects Portion Parcel 2)

29.   A document recorded September 10, 1946 in Book 663, Page 157 of Official Records.

      From:        Imperial Irrigation District
      To:          Wendell Callahan


      (Affects South 39 Acres Tract 157 Portion Parcel 2)

30.   A document recorded December 10, 1947 in Book 688, Page 79 of Official Records.

      From:        Imperial Irrigation District
      To:          United States of America


      (Affects Portion Parcel 2)

31.   A document recorded October 15, 1952 in Book 846, Page 492 of Official Records.

      From:        Imperial Irrigation District
      To:          Wendell Callahan, a single man


      (Affects South 39 Acres Tract 157 Portion Parcel 2)

32.   A document recorded October 15, 1952 in Book 846, Page 493 of Official Records.

      From:        Wendell Callahan
      To:          United States of America


      (Affects South 39 Acres Tract 157 Portion Parcel 2)

33.   A document recorded August 22, 1958 in Book 1002, Page 637 of Official Records.

      From:        Victor Hugo Callahan AKA Hugh Callahan, a single man
      To:          Wendell Callahan, a married man AKA Wendell Phillip Callahan

34.  A document recorded December 20, 1989 as Instrument No. 1989-20854 in Book 1638, Page 382 of Official Records.

     From:          Imperial Irrigation District
     To:             County of Imperial

     (Affects Lots 3, 4, 5, 6, 7 Portion of Parcel 1)

This Guarantee does not cover:

1.  Taxes, assessments, and matters related thereto.
2.  Instruments, proceedings or other matters which do not specifically describe the land.

The map attached, if any, may or may not be a survey of the land depicted hereon. First American Title Company expressly disclaims any liability for loss or damage which may result from reliance on this map except to the extent coverage for such loss or damage is expressly provided by the terms and provisions of the title insurance policy, if any, to which this map is attached.



First American Title Company
3633 Inland Empire Blvd, Suite 130
Ontario, CA 91764

**Illegal Restrictive Covenants**

Please be advised that any provision contained in this document, or in a document that is attached, linked, or referenced in this document, that under applicable law illegally discriminates against a class of individuals based upon personal characteristics such as race, color, religion, sex, sexual orientation, gender identity, familial status, disability, national origin, or any other legally protected class, is illegal and unenforceable by law.

# EXHIBIT B

James L. Arrasmith, Esq., SBN 332498
The Law Offices of James L. Arrasmith
5150 Sunrise Boulevard, Suite G-1
Fair Oaks, CA 95628
Telephone: (916) 974-9835
E-mail: wolves@jlegal.org

Attorney for *Plaintiff, ROBERT EVANS*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ROBERT EVANS,** | **Case No.: 3:25-cv-00249-TWR-LR** |
| *Plaintiff,* | **DECLARATION OF BETTY JEAN WALLICE IN SUPPORT OF PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| v. | |
| **COUNTY OF IMPERIAL; STATE OF CALIFORNIA; and DOES 1–50, inclusive,** | |
| *Defendants.* | **Judge:** Hon. Todd W. Robinson |
| | **Courtroom:** 14A |

I, Betty Jean Wallice, declare as follows:

1. I am over the age of eighteen and am competent to testify to the matters set forth below. I make this declaration in support of the First Amended Complaint of Plaintiff Robert Evans, Jr. The facts stated herein are based on my own personal knowledge, except for those matters stated on information and belief, and as to those matters I believe them to be true. If called as a witness, I could and would testify competently to the facts stated herein.

2. I was born in 1933 and was raised in the Imperial Valley, in and around El Centro and Calexico, California. I attended grade school and high school in that area and graduated from high school in 1951. I lived in the Imperial Valley throughout my childhood and youth.

1

DECLARATION OF BETTY JEAN WALLICE IN SUPPORT OF PLAINTIFF'S FIRST AMENDED COMPLAINT

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

3.  In January 1951, I married Robert Evans. Together we had two children: my son Robert Evans Jr., who is the Plaintiff in this action, and my son Terry Evans. My former husband, Robert Evans, was raised within the Evans family household by Albert Evans and Albert Evans' wife, Mary Pearl Evans. Robert Evans and I later separated and divorced. I subsequently married Mr. Wallice, who passed away in 2018, and I have used the surname Wallice since that marriage.

4.  Because I grew up in the Imperial Valley and later married into the Evans family, I have long-standing personal knowledge of the Evans family and its history. During my childhood and youth, I personally knew the Evans family and visited the Evans family's property in the Imperial Valley on many occasions.

5.  Albert Evans owned and operated a dairy farm in the Imperial Valley. I personally visited that dairy farm during my childhood. It was an active, working farm. My own family also farmed in the Imperial Valley; my father worked as a labor contractor for crops in the area, and our family grew sweet potatoes. As was common in that farming community, families helped one another with their farms—our family would help the Evans family and other families, and they in turn would help us.

6.  The Imperial Valley in those years was a small, close-knit rural community. People knew one another and were generally familiar with one another's affairs. There were very few Black families in the area at that time—I knew of only two or three—and the Evans family was one of them. Because the community was so small and interconnected, the affairs of local families, including matters concerning their land, were widely known and discussed among residents.

7.  From my time within the Evans family and the surrounding community, I am aware that the Evans family's land in the Imperial Valley was a recurring subject of discussion and concern within the family and the community. I recall my former husband, Robert Evans, telling me about a matter concerning the family's land in which a portion of the land was transferred back to Albert Evans for the sum of one dollar. This was a matter that was talked about in the community.

8.  I also recall that, during a period when Albert Evans and Mary Pearl Evans were separated, Mary Pearl Evans was working to obtain her portion of the family's land,

2

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

DECLARATION OF BETTY JEAN WALLICE IN SUPPORT OF PLAINTIFF'S FIRST AMENDED COMPLAINT

and that she was assisted in those efforts—including in connection with proceedings at a lawyer's office—by a woman whom I recall as Daisy Lucas. During part of the time these matters were being addressed, Daisy Lucas stayed with my former husband and me.

9. Albert Evans was an older man during the years I knew the family, and he has long since passed away. I do not recall the exact year of his death.

10. I am willing to testify to the matters set forth in this declaration, and I provide this declaration voluntarily in support of my son Robert Evans, Jr. and the Evans family's effort concerning the land in the Imperial Valley.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on June 9, 2026, at San Bernardino, California.

*Betty Jean Wallice*

**BETTY JEAN WALLICE**
Declarant

**THE LAW OFFICES OF JAMES L. ARRASMITH**
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

3

DECLARATION OF BETTY JEAN WALLICE IN SUPPORT OF PLAINTIFF'S FIRST AMENDED COMPLAINT

# EXHIBIT C

James L. Arrasmith, Esq., SBN 332498
The Law Offices of James L. Arrasmith
5150 Sunrise Boulevard, Suite G-1
Fair Oaks, CA 95628
Telephone: (916) 974-9835
E-mail: wolves@jlegal.org

Attorney for *Plaintiff, ROBERT EVANS*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ROBERT EVANS,** | **Case No.: 3:25-cv-00249-TWR-LR** |
| *Plaintiff,* | **DECLARATION OF AUGUSTINE EVANS JR. IN SUPPORT OF PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| v. | |
| **COUNTY OF IMPERIAL; STATE OF CALIFORNIA; and DOES 1–50, inclusive,** | |
| *Defendants.* | **Judge:** Hon. Todd W. Robinson |
| | **Courtroom:** 14A |

I, AUGUSTINE EVANS JR., declare as follows:

1. I am over the age of 18 and am competent to testify to the matters set forth in this declaration. The statements in this declaration are based on my own personal knowledge, my personal observations, family history that was related to me by my relatives, and research I have personally conducted into my family's history. Where a fact was told to me by a family member or learned through my own research rather than personally witnessed by me, I have tried to identify it as such. If called as a witness, I could and would testify competently to these matters.

1

DECLARATION OF AUGUSTINE EVANS JR. IN SUPPORT OF PLAINTIFF'S FIRST AMENDED COMPLAINT

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

THE LAW OFFICES OF JAMES L. ARRASMITH

A PROFESSIONAL LAW CORPORATION

5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628

TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

2. I am a grandson of Albert Evans, who is the property owner at the center of this case. Albert Evans was my paternal grandfather. Plaintiff Robert Evans is my cousin. I understand that Robert Evans is also a grandson of Albert Evans.

3. I was born in 1952. My grandfather, Albert Evans, died in or about December 1965, when I was approximately thirteen years old. Because I was a child during the years I knew him, and because, in that era, the adults in my family generally did not discuss family or business matters with children, much of what I know about my grandfather and his land I learned later in life—partly from what older relatives told me and partly from research I undertook on my own as an adult.

4. When I was young, my family would travel to Seeley, California, to visit my grandfather, and I remember seeing him on the porch of his home there. He was a physically large man. Based on research I later conducted, I understand he stood about six feet four inches tall and weighed about one hundred ninety pounds, which was notably large for a man of his generation.

5. From family history and my own research, I understand the following about my grandfather's background: he was born in 1883; he came from Tennessee; and his parents were from Georgia. Before he came to the Imperial Valley, he lived in Tulare County, California, in a town called Tipton.

6. My grandfather was a dairy farmer and was regarded as a pioneer of the Imperial Valley. He registered for the draft, and I have a draft record reflecting a registration in or about 1918. He was also listed for the draft during World War II, when he was about sixty years old, although he was not taken. My father told me that when my grandfather's sons were drafted, my grandfather offered to serve in their place

2

DECLARATION OF AUGUSTINE EVANS JR. IN SUPPORT OF PLAINTIFF'S FIRST AMENDED COMPLAINT

because he did not want them to leave. My grandfather had approximately twelve children.

7. From family history and my own research, I understand that my grandfather at one time owned property in an area known as Silsbee, located near what later became the naval base in the area. Silsbee no longer exists as a town today; there is still a road by that name in the vicinity. I understand the soil in that area was very fertile, having been enriched by flooding from the Colorado River, including a major flood in or about 1905, and that the Silsbee townsite, including its post office, was later washed out by flooding.

8. My father told me that my grandfather lived in a nice two-story house on his land and did not want to leave it. Based on what my family related to me, it is my understanding that my grandfather was forced to move and to relocate his cattle and dairy operation to a new site, and that he ultimately came to live in Seeley. I do not know all of the details of how and when he came to relocate to Seeley. I understand the land my grandfather had near the present naval base is within or near the area now used by the military, which I understand is referred to as the Naval Air Facility El Centro.

9. My father and my uncles—including those I knew as Gartrelle, Gordon, Garther, Augustine, and Wilbur—helped my grandfather try to fight for his land. Several of my uncles served in the military.

10. I have learned, including through research by my cousin Robert, that my grandfather was once involved in an incident in Holtville in which, during an argument over a calf, a man came at him with a stool, and my grandfather shot and wounded the man

3

**THE LAW OFFICES OF JAMES L. ARRASMITH**
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

DECLARATION OF AUGUSTINE EVANS JR. IN SUPPORT OF PLAINTIFF'S FIRST AMENDED COMPLAINT

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

in the arm. The man was not killed. My grandfather was tried twice and was acquitted at the second trial. I understand that this was a significant local news story at the time.

11. After I left the military, I visited the Imperial County fairgrounds, where I met a man who, I later learned, authored a local historical magazine. When I told him my name, he asked whether I knew that my grandfather had been a pioneer in the area. I told him I did not. He showed me the magazine, which featured my grandfather, and he signed a copy for me, which I still have. Learning this is part of how I came to research and understand my grandfather's history.

12. My father told me that when my grandfather died, a large number of white residents from across the valley attended his funeral, which surprised our family. My grandfather had delivered milk in the area and was known to many people in the community.

13. From my own knowledge and observations growing up in the Imperial Valley, and from what older relatives told me, the Imperial Valley was a segregated and, at times, racially hostile place during my grandfather's lifetime and during my own childhood. In El Centro, Black and white students were separated. Before there was a single, integrated El Centro High School, I understood there to be a separate school for Black students named Frederick Douglass, and a school named Washington. I also understand that an educator who had come from Tulare County—and who, I understand, was associated with Colonel Allensworth and had helped establish the first Black school district in California—moved to the Imperial

4

DECLARATION OF AUGUSTINE EVANS JR. IN SUPPORT OF PLAINTIFF'S FIRST AMENDED COMPLAINT

Valley, attempted to enroll his daughters in the El Centro schools, was refused, and, as a result, helped establish a separate school district for Black children.

14. In the town of Imperial, where I grew up, a highway divided the town; white residents lived on the west side of the highway, and Black residents lived on the other side. I understand that before the highway was built, Black residents were similarly confined to one part of town. I personally experienced being treated differently because I am Black—for example, being watched in stores and, at times, not being served at lunch counters. Older Black residents told me that such discrimination had been worse in earlier years.

15. Based on the family history related to me and the racial climate of the time, it is my understanding and belief that my grandfather—a successful Black landowner who had prevailed in the criminal case described above—was resented by some in the community, and that this racial hostility was part of the circumstances surrounding the loss of his land. I cannot independently establish the motivations of the particular officials involved, and I offer this paragraph as my belief based on the matters described above.

16. Approximately three to four months before the date of this declaration, I prepared a written history of my grandfather, Albert Evans, which I originally wrote for a family member. That written history is approximately seven pages long and sets out much of the information described in this declaration. I have provided a copy of that written history to Plaintiff's counsel.

17. For most of my life, the details of my grandfather's land and the circumstances under which he lost it were not openly discussed within my family. As a child, I

5

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

was not told these things, and the members of the older generation who had firsthand knowledge have largely passed away. Much of what I now know I pieced together as an adult through conversations with relatives and through my own historical research. To my knowledge, our family did not have access to the records or information that would have explained what happened to my grandfather's land until relatively recently.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on June 9, 2026, at San Diego, California.

*Augustine Evans*

AUGUSTINE EVANS JR.
Declarant

6

DECLARATION OF AUGUSTINE EVANS JR. IN SUPPORT OF PLAINTIFF'S FIRST AMENDED COMPLAINT

THE LAW OFFICES OF JAMES L. ARRASMITH
A PROFESSIONAL LAW CORPORATION
5150 Sunrise Boulevard, Suite G-1 Fair Oaks, CA 95628
TELEPHONE: (916) 974-9835 | EMAIL: wolves@jlegal.org

# DECLARATION OF AUGUSTINE EVANS JR

Final Audit Report                                                2026-06-09

| | |
|---|---|
| Created: | 2026-06-09 |
| By: | Sheva Mehrfar (sheva@jlegal.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAn-hgyPQpgXF5BfWMFIr1sV8tFBrumPue |

## "DECLARATION OF AUGUSTINE EVANS JR" History

📄 Document created by Sheva Mehrfar (sheva@jlegal.org)
2026-06-09 - 9:58:48 PM GMT

✉ Document emailed to Augustine Evans (age52@aol.com) for signature
2026-06-09 - 9:58:52 PM GMT

📄 Email viewed by Augustine Evans (age52@aol.com)
2026-06-09 - 9:59:55 PM GMT

🖊 Document e-signed by Augustine Evans (age52@aol.com)
Signature Date: 2026-06-09 - 10:00:48 PM GMT - Time Source: server - Signature Appearance Selected: TYPE

✅ Agreement completed.
2026-06-09 - 10:00:48 PM GMT

**Adobe Acrobat Sign**

# EXHIBIT D

**U.S. Postal Service™**
**CERTIFIED MAIL RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

| Certified Mail Fee | |
|---|---|
| $ | |

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)          $ _____
☐ Return Receipt (electronic)        $ _____
☐ Certified Mail Restricted Delivery  $ _____
☐ Adult Signature Required           $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage
$

Total Postage and Fees
$

Sent To the State of California, the office of the Governor

Street and Apt. No., or PO Box No.
1021 O street, Suite 9000

City, State, ZIP+4®
Sacramento, CA, 95814

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

CERTIFIED MAIL®

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

7022 1670 0001 3365 3167

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

the State of California,
the Office Of the Governor,
1021 O Street, Suite 9000,
Sacramento, CA, 95814

9590 9402 7869 2234 1703 22

2. Article Number (Transfer from service label)

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by (Printed Name) | C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053     Domestic Return Receipt

USPS TRACKING #

9590 9402 7869 2234 1703 22

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States
Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

James L. Arrasmith
the law offices of James L. Arrasmith
9719 Lincoln Village Drive
Suite 507
Sacramento, CA, 95827

James L. Arrasmith
The Law Offices of James L. Arrasmith
9719 Lincoln Village Dr., Suite #507
Sacramento, CA 95827

the State of California, the office of the Governor
1021 O Street, Suite 9000
Sacramento, CA, 95814

CERTIFIED MAIL

7022 1670 0001 3365 3143

7022 1670 0001 3365 3143

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

| Certified Mail Fee | |
|---|---|
| $ | |
| Extra Services & Fees *(check box, add fee as appropriate)* | |
| ☐ Return Receipt (hardcopy) | $ _____ |
| ☐ Return Receipt (electronic) | $ _____ |
| ☐ Certified Mail Restricted Delivery | $ _____ |
| ☐ Adult Signature Required | $ _____ |
| ☐ Adult Signature Restricted Delivery | $ _____ |
| Postage | |
| $ | |
| Total Postage and Fees | |
| $ | |

Postmark
Here

Sent To  the County of Imperial, California

Street and Apt. No., or PO Box No.  940 W. Main Street

City, State, ZIP+4®  El centro, CA, 92243

PS Form 3800, April 2015 PSN 7530-02-000-9047      See Reverse for Instructions



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

the County of Emperial, CA
940 W. Main Street
El Centro, CA, 92243

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                          ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

9590 9402 7869 2234 1703 53

2. Article Number (Transfer from service label)

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

USPS TRACKING #

9590 9402 7869 2234 1703 53

**United States Postal Service**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

James L. Armsmith
the law offices of James L. Armsmith
9719 Lincoln village Drive, Suite 507
Sacramento, CA, 95827

James L. Arrasmith
The Law Offices of James L. Arrasmith
9719 Lincoln Village Dr., Suite #507
Sacramento, CA 95827

the County Of Imperial, California
940 W. Main Street
El Centro, CA, 92243



SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

COMPLETE THIS SECTION ON DELIVERY

A. Signature

X ☐ Agent
☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

1. Article Addressed to:

the City of El centro
1275 W. Main Street
El centro, CA, 92243

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below:     ☐ No

9590 9402 7869 2234 1702 85

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

2. Article Number (Transfer from service label)

PS Form 3811, July 2020 PSN 7530-02-000-9053     Domestic Return Receipt

**USPS TRACKING #**

9590 9402 7869 2234 1702 85

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States
Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

James L. Arrasmith
the law Offices of James L. Arrasmith
9719 Lincoln Village Drive
Suite 507
Sacramento, CA, 95827

James L. Arrasmith
The Law Offices of James L. Arrasmith
9719 Lincoln Village Dr., Suite #507
Sacramento, CA 95827

the City Of El centro
1275 W. Main Street
El Centro, CA, 92243